CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
TERRA CASTILLO LAUGHTON (Bar No. 321683)
(E-Mail: Terra_Laughton@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

Attorneys for Defendant
*Adrian Benavides-Schorgi*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| UNITED STATES OF AMERICA | Case No.  2:23-CR-00164-JVS |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S POSITION REGARDING SENTENCING; EXHIBITS** |
| ADRIAN BENAVIDES-SCHORGI | |
| Defendant. | |

Defendant Adrian Benavides-Schorgi, by and through his counsel of record, Deputy Federal Public Defender Terra Castillo Laughton, hereby submits his position regarding sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 3, 2024          By  */s/ Terra D. Castillo Laughton*

TERRA D. CASTILLO LAUGHTON
Deputy Federal Public Defender

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................ 1

II. PROCEDURAL HISTORY ....................................................................... 1

III. THE PRESENTENCE REPORT AND RECOMMENDATION............................ 2

IV. THE APPROPRIATE SENTENCE.......................................................... 3

    A.    Legal Standard .............................................................................. 3

    B.    A Downward Variance is Appropriate Based on Mr. Benavides Schorgi's History and Characteristics ............................................ 3

        1.    Mr. Benavides-Schorgi lost two father figures by the age of twenty. ................................................................. 3

        2.    Mr. Benavides-Schorgi is 23 years old and has no criminal history points. ....................................................... 8

    C.    The Nature and Circumstances of the Offense Further Justify a Downward Variance. ...................................................................... 9

        1.    Mr. Benavides-Schorgi did not know the pills contained fentanyl. ................................................................. 9

        2.    Mr. Benavides-Schorgi was using significant amounts of marijuana during the offense conduct and primarily sold marijuana. ........................................................... 11

        3.    When confronted by law enforcement and told what had happened, Mr. Benavides-Schorgi immediately expressed sincere remorse. ................................................. 13

    D.    A sentence of 120 months imprisonment would achieve deterrence, necessary treatment, and avoid unwarranted sentencing disparities. ........ 13

V. CONCLUSION ......................................................................................... 15

i

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Twenty-three-year-old Adrian Benavides-Schorgi would do anything for his family.

After losing two father figures before the age of 20, Mr. Benavides-Schorgi was forced to step up and provide for his mom and brother.  At a certain point, he made the mistake of selling drugs, mainly marijuana, to make ends meet and to pay for his own drug use.  What happened in this case was tragic and Mr. Benavides-Schorgi has been extremely remorseful since he was first confronted by law enforcement nearly two years ago.  He did not know that the three pills he sold to S.S. contained fentanyl and he did not intend to cause injury to the victims.

Mr. Benavides-Schorgi was just 21, and relying on marijuana daily himself, when the offense occurred.  He has no criminal history points.  He became a father for the first time two weeks after he was arrested last year, and has not yet been able to hold his son.  Rather than spending his entire youth incarcerated, he wants the chance to help raise his child.

For all the reasons discussed below, Mr. Benavides-Schorgi respectfully requests a sentence of 120 months.  Probation agrees that a 120-month sentence is appropriate, in light of Mr. Benavides-Schorgi's "substance abuse history, his disadvantaged upbringing, and stable employment," as well as his limited criminal history.  ECF No. 41 (hereinafter "PSR") at ¶ 117; *see also* ECF 40 (Disclosed Recommendation Letter) at 1, 5.

## II. PROCEDURAL HISTORY

Mr. Benavides-Schorgi had his initial appearance on April 28, 2023.  ECF No. 14 (minutes of PIA).  He was ordered detained and has remained in custody since that time.  ECF No. 9 (minutes granting request for detention).  On February 5, 2024, he pled guilty to a first superseding information, pursuant to a plea agreement.  ECF No. 31 (plea agreement); ECF No. 39 (minutes of change of plea).

1

### III. THE PRESENTENCE REPORT AND RECOMMENDATION

Mr. Benavides-Schorgi agrees with the Presentence Investigation Report's Guidelines calculation and advisory sentencing range of 168-210 months, and with its recommendation of a 120-month sentence. PSR at 3; ECF No. 40. He makes the following objections to the PSR:

Paragraph 7: In his plea agreement, Mr. Benavides-Schorgi agreed to a search condition but not a suspicionless one. The agreed-upon search condition requires "reasonable suspicion." *See* ECF 31 (Plea Agreement) at ¶ 2(i)(i). Mr. Benavides-Schorgi does not object to proposed condition #8 in Probation's disclosed recommendation letter, which contains this language. ECF No. 40 at 2-3.

Paragraph 15 and 21: These paragraphs appear to contain a typo in the date, referring to March 24, 2022 and March 25, 2022, instead of *May* 24, 2022 and *May* 25, 2022.

Paragraphs 43-47: Mr. Benavides-Schorgi objects to the inclusion of additional allegations regarding surveillance conducted on him in 2022 after the instant offense. As Probation acknowledges, this is "Not Part of Relevant Conduct." PSR at 9 (heading before ¶ 43). Nor it is actually "Offense Behavior." *Id.* Rather, these paragraphs consist of unproven allegations of what a police officer claimed to have witnessed, which is not sufficiently reliable for the Court to rely upon at sentencing. *See generally Shepard v. United States*, 544 U.S. 13 (2005); U.S.S.G. § 6A1.3(a) (information considered at sentencing that relates to disputed factors must have "sufficient indicia of reliability to support its probable accuracy"). Paragraphs 43-47 should therefore be stricken from the PSR.

Paragraph 51: Mr. Benavides-Schorgi's 2022 misdemeanor conviction for reckless driving should be assessed zero points, rather than one point. Under Section 4A1.2 of the Guidelines, sentences for misdemeanor "careless or reckless driving" are counted "only if (A) the sentence was a term of probation of *more than one year* or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an

2

instant offense." U.S.S.G. §4A1.2(c)(1) (emphasis added). In his reckless driving case, Mr. Benavides-Schorgi pled no contest to reckless driving and was sentenced to 12 months of probation, and a fine or 3 days in jail—below the threshold for Section 4A1.2(c)(1)(A). PSR ¶ 51. The remaining charges were dismissed. *Id.* Moreover, reckless driving is unrelated to the instant offense of distribution of fentanyl. *See* U.S.S.G. §4A1.2(c)(1)(B). Thus, this prior conviction should not generate any criminal history points.

## IV. THE APPROPRIATE SENTENCE

### A. Legal Standard

The Sentencing Guidelines are "effectively advisory." *United States v. Booker*, 543 U.S. 220, 245 (2005); *see also Kimbrough v. United States*, 552 U.S. 85, 91 (2007). The Court "shall impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing. *See* 18 U.S.C. §§ 3553(a), 3661. In determining the appropriate sentence, courts must consider the factors enumerated in Section 3553(a), including the nature and circumstances of the offense, the history and characteristics of the offender, and the need for the sentence imposed to adequately address punishment, deterrence, protection of the public, and needed training or treatment of the defendant. 18 U.S.C. § 3553(a); *Booker*, 543 U.S. at 220.

When those factors are fully considered, a sentence of 120 months is appropriate here, as Probation recommends.

### B. A Downward Variance is Appropriate Based on Mr. Benavides Schorgi's History and Characteristics

1. Mr. Benavides-Schorgi lost two father figures by the age of twenty.

As detailed in the PSR, Mr. Benavides-Schorgi grew up with his younger brother, Henry, in violent and gang-infested neighborhoods in Los Angeles. PSR at ¶¶ 59, 61. He witnessed gunshots, fights, theft, and a gang shootout. *Id.* at ¶ 61. Until he was about 12 years old, he was raised by his father and his mother, Nancy. *Id.* at ¶ 59. His father was the breadwinner, earning an income doing flooring work and

working for a moving company.  *Id.* at¶ 62.  He was abusive, and would hit Mr. Benavides-Schorgi, make him kneel on uncooked rice, whip him with a cable, and make him take cold showers while he whipped him.  *Id.* at ¶ 63.

When Mr. Benavides-Schorgi was around 12 years old, the family discovered that his father was using methamphetamine.  *Id.* at ¶ 64.  Mr. Benavides-Schorgi and his mother caught him injecting methamphetamine in the bathroom and his mother kicked his father out of the house.  *Id.*  His father tried repeatedly to reconnect, including when he was homeless living on the streets.  But Mr. Benavides-Schorgi did not have further contact with him and he was not reintegrated into the family.  *Id.* at ¶ 66.  Mr. Benavides-Schorgi's early exposure to drugs began to normalize drug use in his young mind.

With his father gone, Mr. Benavides-Schorgi, still a child, became the man of the house.  He immediately felt a deep sense of obligation to care for and provide for his mother and his younger brother.  Their family began to struggle financially without their breadwinner.  Mr. Benavides-Schorgi's immediate family of three moved around to several different apartments and even slept in their car for a short time.  *Id.* at ¶ 67. They relied on the support of Mr. Benavides-Schorgi's grandmother, Dora Garceran, and her husband, Jesus Tintos.  *Id.* at ¶ 65.  Jesus worked as a mechanic and helped provide for them.  They eventually moved in with Jesus and Dora for several years.  *Id.* at ¶ 67.

While living together, Jesus took on an important role in Mr. Benavides-Schorgi's life.  He became a father figure.  *Id.*  Jesus emphasized the importance of hard work and education, and would ask Mr. Benavides-Schorgi about what he was learning in school.  *Id.*  If he did well on a test, Jesus would reward him by taking him out to eat.  *Id.*  The family went to church on Sundays and would spend time playing soccer in a park afterward.  *Id.*  Jesus insisted Mr. Benavides-Schorgi graduate from high school and pursue a college education.  *Id.*  Mr. Benavides-Schorgi passed along these values to his longtime partner, Alondra Calderon, and his brother, Henry.  *See* Ex.

4

1 (Ms. Calderon: "As we grew older, he encouraged me to continue my education.  He would pick me off from college and we'd go out for lunch."); Ex. 3 (Henry Benavides: "Adrian is the type to push people to keep chasing their goals . . . [he] was always by my side for big accomplishments we both did"; noting that Adrian will guide his own son to "get educated as well").

In large part thanks to the support of Jesus, Dora, and Nancy, Mr. Benavides-Schorgi did not join a gang and finished high school.  His family was very proud to see him graduate.  PSR at ¶ 86 (verified high school diploma).  However, to deal with stress and anxiety related to the struggles of his childhood, Mr. Benavides-Schorgi had begun smoking marijuana around 13 years old.  *Id.* at ¶ 82.  By the age of 16, he was smoking daily.  *Id.*

Around the time of Mr. Benavides-Schorgi's high school graduation, Jesus began having extra-marital affairs and distancing himself from the family.  *Id.* ¶ 70.  He fell out of touch with Mr. Benavides-Schorgi and started to ignore him.  *Id.*  This was painful for Mr. Benavides-Schorgi, who had to cope with losing his second father figure.  *Id.*

In 2020, during the COVID-19 pandemic, Jesus was spending time in Mexico and Mr. Benavides-Schorgi planned to go see him.  But before their visit, Jesus contracted COVID and died over Thanksgiving.  *Id.* at ¶ 71.  This was a tragic loss for Mr. Benavides-Schorgi.  It also meant that his immediate family could no longer rely on Dora and Jesus for financial support.  *Id.*

To cope with their new financial reality, Mr. Benavides-Schorgi had to work hard.  His partner of ten years, Ms. Calderon, explains in her letter to the Court that he "has worked since he was able to" and "decided at a young age to be there for his mother and brother."  *See* Ex. 1.  He was working in demolition and began to work as much as he could, including double shifts, in a "hard and dedicated hustle."  *Id.*; *see also* PSR at ¶ 90 (summarizing a letter from his employer praising his "interpersonal

and communication skills").  To supplement his income and pay the family's rent and other bills, as well as to support his own addiction, he began selling marijuana.

Before Mr. Benavides-Schorgi was arrested in this case, he and Ms. Calderon found out they were pregnant with their first child, a son.  Ms. Calderon explains that he "never missed any of my doctors appointments to see his baby's progress and health."  Ex. 1.  She also recounts that "when we almost lost our baby boy he stayed by my side and never left."  *Id.*  Later in the pregnancy, Mr. Benavides-Schorgi moved in with Ms. Calderon and they began to prepare for their life together as a family of three.  *Id.*  He continued to work hard as they awaited their son's arrival, sometimes only sleeping 3 hours to make sure their expenses were covered.  *Id.*

When Mr. Benavides-Schorgi was arrested, Ms. Calderon was nearly 9 months pregnant.  PSR at ¶ 76.  His son was born just two weeks later.  Ex. 1.  Because Mr. Benavides-Schorgi has been in custody since his arrest, he has been unable to hold his son, who is now about one year old.  *Id.*; PSR at ¶ 76.  Ms. Calderon laments that he "is missing so many of his son's milestones and accomplishments."  Ex. 1.  She looks forward to him being able to be present in the future at school events, graduations, and his son's "firsts."  *Id.*

Below are some pictures of Mr. Benavides-Schorgi with his family:



**Dora, Adrian, and Jesus at a school event**



**Adrian and Jesus at high school graduation**



**Nancy, Adrian, and Henry on prom night**



**Alondra and Adrian with their son's ultrasound**

Mr. Benavides-Schorgi's family describes him as a "good hearted, charismatic, and hardworking young man." Ex. 2 (letter from mother Nancy). His mother notes

7

that he always cared for her and made sure she ate and took her pills to manage her diabetes. *Id.* His brother Henry identifies him as "basically my father figure," who turned Henry into the man he is now. Ex. 3. Angel Jesus Tintos, Jesus's son, expresses that Mr. Benavides-Schorgi had a "hard childhood . . . without a father" and that he worked hard to help his mom with household expenses. Ex. 4. Angel also says he is missed at family holidays. *Id.*

As a result of his difficult childhood, Mr. Benavides-Schorgi was instilled with a determination to provide for his family. This noble goal ultimately led him astray and he has now missed out on his son's first year of life. In light of these factors, a downward variance to 120 months is appropriate.

> 2. <u>Mr. Benavides-Schorgi is 23 years old and has no criminal history points.</u>

A downward variance to 120 months is also supported by Mr. Benavides-Schorgi's age and his lack of criminal history.[1]

Mr. Benavides Schorgi was just 21 years old when the offense conduct occurred, and is now 23. The PSR notes that the Guidelines recognize age may be relevant to sentencing. *See* PSR ¶ 115 (citing U.S.S.G. § 5H1.1); ECF No. 40 at 5.[2] While Mr. Benavides-Schorgi does not seek a departure, he was a young adult when the offense occurred and, as discussed below, was smoking significant amounts of marijuana at the time. He also suffered from adverse childhood experiences, and at the same time has demonstrated he is amenable to rehabilitation. The Court may vary downward on these grounds. *See generally* ECF No. 40 at 5 ("[T]he Probation Officer would alternatively

---

[1] Mr. Benavides-Schorgi agreed in his plea agreement not to argue for departures or adjustments relating to the offense level. *See* ECF No. 31 (Plea Agreement) at ¶ 14. He is in no way asserting that any such departures or adjustments apply here.

[2] A proposed amendment to the Guidelines expected to go into effect on November 1, 2024 will further clarify the importance of a defendant's youthfulness at the time of the offense. *See* Amendments to the Sentencing Guidelines, § 5H1.1, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202405_Amendments.pdf.

8

1   recommend a variance to 120 months custody based on the totality of statutory
2   sentencing factors.").

3        In addition, Mr. Benavides-Schorgi has zero criminal history points.  *See*
4   Objections, *supra*.  In 2023, the Guidelines were amended to add a downward
5   adjustment for zero-point offenders.  U.S.S.G. § 4C1.1.  Although the adjustment
6   excludes offenses resulting in death or serious bodily injury, a downward variance is
7   appropriate because Mr. Benavides-Schorgi did not know the pills contained fentanyl.
8   *See* Part IV.C.1 below.  Consider, by contrast, an individual with no criminal history
9   who purposely sold fentanyl, knowing it was fentanyl and how dangerous it was, but
10  where the buyer had a high tolerance and therefore did not suffer an overdose.  That
11  individual would get the benefit of the zero-point offender adjustment.  Mr. Benavides-
12  Schorgi should be granted a variance given his lack of knowledge and zero criminal
13  history points.

14       Mr. Benavides-Schorgi's young age at the time of the offense, combined with his
15  lack of criminal history, supports his (and Probation's) requested sentence of 120
16  months.

17  **C.   The Nature and Circumstances of the Offense Further Justify a**
18  **Downward Variance.**

19       1.   Mr. Benavides-Schorgi did not know the pills contained fentanyl.

20       Mr. Benavides-Schorgi was originally charged under 21 U.S.C. § 841(b)(1)(C)
21  for distribution of fentanyl resulting in serious bodily injury.  ECF No. 1 (Indictment).
22  He pled guilty to distribution of fentanyl, and agreed in his plea agreement that a base
23  offense level of 38 applies because of the serious bodily injury suffered by the victims.
24  PSR ¶8; ECF No. 32 (First Superseding Information); ECF No. 31 (Plea Agreement) at
25  ¶13.  Section 2D1.1(a)(2) of the Guidelines and the underlying statute on which it is
26  based, Section 841(b)(1)(C), suffer from several related issues that render them
27  disproportionately punitive and effectively a strict liability offense, especially as
28  applied to this case.

9

*First*, the defendant need not know that the drug he is selling is or contains fentanyl—simply that it is or contains *some* controlled substance.  *See* Manual of Model Criminal Jury Instructions (9th Cir.) at § 12.4.  *Second*, no specific mental state is required with respect to the injury or death prong.  Thus, a defendant need not intend to cause serious bodily injury or death to the victim, know he is causing it, or even be reckless with respect to that result.  *See, e.g.*, *United States v. Mayers-Johnson*, 2:19-cr-270-ODW (C.D. Cal.), ECF No. 40 (motion to dismiss under the Fifth and Sixth Amendments due to the lack of *mens rea* requirement with respect to the resulting-in-death component of the offense).  *Third*, there is no proximate cause requirement; it is sufficient that the drug distributed is a but-for cause of the death or injury.  *See United States v. Houston*, 406 F.3d 1121, 1124–25 (9th Cir. 2005) ("We therefore join our sister circuits in holding that proximate cause is not a required element for conviction and sentencing under § 841(b)(1)(C) . . . [a]ll that is necessary under the statutory language is that 'death . . . results'"); *see also United States v. Burrage*, 571 U.S. 204, 210 (2014) (analyzing but-for causation and reserving ruling on the proximate cause issue).  In sum, a defendant who does not know he is selling fentanyl and does not intend to cause serious bodily injury is still held criminally liable for that injury.

This describes Mr. Benavides-Schorgi.  He sold three pills in a single transaction to one individual, but did not know that the pills he sold contained fentanyl, as he more typically sold marijuana.  *See* ECF No. 31 (Plea Agreement) at ¶11 (factual basis stating "Defendant did not know the pills contained fentanyl.").  Nor is there any evidence he intended to cause injury to the victims or knew he was causing them injury.  To the contrary: when law enforcement agents informed him what had happened to the victims, he immediately became emotional and remorseful.  *See* Part IV.C.3 below.

This framework results in defendants like Mr. Benavides-Schorgi facing sentencing exposure comparable to (or even much higher than) certain intentionally violent offenders, as illustrated by the following table:

| | Second-degree murder  18 U.S.C. § 1111 | Manslaughter  18 U.S.C. § 1112 | Attempted murder  18 U.S.C. § 1113 | Attempted manslaughter  18 U.S.C. § 1113 | Mr. Benavides-Schorgi's case  21 U.S.C. § 841(b)(1)(C) |
|---|---|---|---|---|---|
| Mandatory Minimum | None | None | None | None | None under charge of conviction; 20 years as originally charged |
| Statutory Maximum | Life | 15 years (voluntary); 8 years (involuntary) | 20 years | 7 years | 20 years under charge of conviction; life as originally charged |
| Base Offense Level | 38  U.S.S.G. § 2A1.2 | 29 (voluntary); 12-22 (involuntary)  U.S.S.G. §§ 2A1.3 & 2A1.4 | 33 (attempted first-degree murder); 27 (otherwise)  U.S.S.G. § 2A2.1 | 14  U.S.S.G. § 2A2.2 | 38  U.S.S.G. § 2D1.1 |

As this table reflects, an individual convicted of manslaughter or attempted murder begins at a significantly lower base offense level than Mr. Benavides-Schorgi.

As a policy matter, the sentencing scheme is also counterproductive. Due to the risk of harsh sentencing outcomes, individuals who consume fentanyl or witness others doing so are afraid to report overdoses for fear of being punished for their involvement. *See generally* Ex. 5 (criticism of proposed state sentencing scheme by mother of deceased overdose victim).

The flawed and disproportionate nature of the applicable sentencing scheme further justifies a downward variance, especially under the specific facts of this case.

2.    Mr. Benavides-Schorgi was using significant amounts of marijuana during the offense conduct and primarily sold marijuana.

By the time of the offense conduct, Mr. Benavides-Schorgi was smoking up to 10 blunts (marijuana cigars) per day and was under the influence when the offense

11

1  occurred.  PSR at ¶¶ 82, 84.  As he acknowledges, this affected his reasoning.  Had he
2  not been relying daily on marijuana, he would not have been involved in this offense.
3  *Id.* at ¶ 84.

4        Scientific literature confirms that chronic marijuana use contributes to poor
5  judgment, impulsivity, and a reduced ability to understand potential negative
6  consequences.  *See, e.g.*, Michael Wesley et al., *Poor Decision-Making by Chronic*
7  *Marijuana Users is Associated with Decreased Functional Responsiveness to Negative*
8  *Consequences*, 191 Psych. Res. 51 (Jan. 30, 2011), available at
9  https://www.sciencedirect.com/science/article/abs/pii/S0925492710003501?via%3Dihu
10 b; Brian F. O'Donnell et al, *Decision Making and Impulsivity in Young Adult Cannabis*
11 *Users*, 12 Front. Psych. (June 30, 2021), available at
12 https://www.frontiersin.org/journals/psychology/articles/10.3389/fpsyg.2021.679904/fu
13 ll.  Mr. Benavides-Schorgi acknowledges his drug use was a problem for him, and is
14 interested in treatment.  PSR at ¶ 85.

15       The record in this case makes clear that in addition to using marijuana, Mr.
16 Benavides-Schorgi primarily sold it, as opposed to other drugs.  This was true for his
17 dealings with victim S.S.  In her interview with law enforcement, S.S. stated that an
18 individual who was later confirmed to be Mr. Benavides-Schorgi was her regular
19 marijuana dealer.  PSR ¶ 14.  She explained that she purchased "Molly" from him only
20 because her regular molly dealer was unavailable.  *Id.*[3]

21       This context shows that Mr. Benavides-Schorgi was not in the business of
22 regularly selling pills or other drugs aside from marijuana.  Together with the impact of
23 Mr. Benavides-Schorgi's own marijuana use, which impaired his judgment, this further
24 justifies a downward variance.

25
26
27
28     [3] Indeed, the only evidence prior to his guilty plea that Mr. Benavides-Schorgi sold S.S. pills—as opposed to marijuana—on May 24, 2022 was her statement to that effect.

3.   <u>When confronted by law enforcement and told what had happened,</u>
     <u>Mr. Benavides-Schorgi immediately expressed sincere remorse.</u>

In September 2022, about four months after the offense occurred, law enforcement officers executed a search warrant at Mr. Benavides-Schorgi's apartment in West Los Angeles.  While at his home, officers interviewed him, asking him questions about his upbringing and drug sales.[4]  Mr. Benavides-Schorgi explained that he sold marijuana to help support his mom and to make ends meet.

More than an hour into the 90-minute interview, the agents told him that the pills he sold had seriously injured people.  Mr. Benavides-Schorgi pleaded with the agents to tell him exactly what had happened.  When they explained that the victims had not died, but had suffered significant injuries, Mr. Benavides-Schorgi began to sob and was emotional throughout the rest of the interview.  Through tears, he said if he could talk to "that person," he would tell them "I'm so sorry."  The agents declined his request to speak directly to the victims, but they acknowledged that that he honestly felt remorse for what happened.  They arrested him six months later.

Mr. Benavides-Schorgi's acceptance of responsibility has continued in this case. He did not file any pretrial motions and pled guilty pursuant to a plea agreement with the government.[5]  *See* ECF No. 39 (minutes of change of plea).

**D.   A sentence of 120 months imprisonment would achieve deterrence, necessary treatment, and avoid unwarranted sentencing disparities.**

This is Mr. Benavides-Schorgi first federal case and the first time he has spent any meaningful time in custody.  Therefore, any sentence imposed will have a significant deterrent effect.  This is especially true because with every day he is in custody, Mr. Benavides-Schorgi is missing out on being a father to his first child.  *See*

---

[4] An audio recording of this interview was produced in discovery.  The description that follows is based on the undersigned's review of the recording.

[5] He did not file any pretrial motions despite being improperly Mirandized during his September 2022 interview with law enforcement and despite the agents inappropriately searching his vehicle based on his mother's consent.

Exs. 1 & 2. He has every reason to remain law-abiding once released. He is personally motivated to do so and his family stands ready to welcome him home and support him upon release. *See* Exs. 1-4. He has goals of attending trade school to become an electrician or plumber. PSR at ¶ 87. In addition, he is interested in owning his own construction or demolition business and helping others by providing jobs. Ex. 1; PSR at ¶ 92. He is also welcome to return to his prior demolition job. PSR at ¶ 90.

While in custody, Mr. Benavides-Schorgi has pursued programming and rehabilitation. He has completed more than 16 classes in Attitudes for Success - Breaking Barriers, and 50 hours of instruction in English as a Second Language. PSR at ¶ 89 (verified certificates of attendance). He is interested in pursuing drug treatment programming and additional educational courses both in and out of custody. *Id.* at ¶ 85.

Mr. Benavides-Schorgi's requested sentence is also consistent with other similar cases in this District. For example, in *United States v. Lopez*, 21-cr-00109-VAP (C.D. Cal.) the defendant was sentenced to 120 months where the victim died from their overdose. *See* ECF No. 53 (Judgment and Commitment Order); ECF No. 31 (Plea Agreement). In *United States v. Castillo*, 21-cr-00570-SVW (C.D. Cal.), the defendant was sentenced to 120 months, in addition to 60 months on a related gun charge, where the victim died and the defendant continued distributing after the victim's death. *See* ECF No. 73 (Judgment and Commitment Order); ECF No. 38 (Plea Agreement). Specifically, after the victim died, Mr. Castillo was found with 863 pills containing fentanyl and two firearms. ECF No. 38.

In contrast here, Mr. Benavides-Schorgi caused serious bodily injury (not death), pled guilty to selling three pills in a single sale on one occasion, did not know the pills he sold contained fentanyl, did not possess any additional fentanyl, and did not possess any guns. Thus, a sentence no more than the 120 months imposed in *Lopez* and *Castillo* is appropriate here and would avoid unwarranted sentencing disparities.

14

# V. CONCLUSION

For the foregoing reasons, Mr. Benavides-Schorgi respectfully requests that the Court adopt Probation's recommendation and sentence him to 120 months.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 3, 2024          By  */s/ Terra Castillo Laughton*
                                 TERRA CASTILLO LAUGHTON
                                 Deputy Federal Public Defender

15

## Index of Exhibits

| Exhibit | Description |
|---------|-------------|
| 1 | Letter from Alondra Calderon |
| 2 | Letter from Nancy Schorgi |
| 3 | Letter from Henry Benavides |
| 4 | Letter from Angel Tintos |
| 5 | *Senate Bill 44 by Sen. Tom Umberg Will Put More People at Risk of Overdosing From Fentanyl*, Orange County Register |

1

**PROOF OF SERVICE**

2

I, **Erica Bustos** declare that I am a resident or employed in Orange County,

3

California; that my business address is the Office of the Federal Public Defender, 411

4

West Fourth Street, Suite 7110, Santa Ana, California  92701-4598, Telephone No.

5

(714) 338-4500; that I am over the age of eighteen years; that I am not a party to the

6

action entitled above; that I am employed by the Federal Public Defender for the

7

Central District of California, who is a member of the Bar of the State of California,

8

and at whose direction I served a copy of the attached **DEFENDANT'S POSITION**

9

**REGARDING SENTENCING; EXHIBITS** on the following individual(s) by:

10

[ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows:

[  ] Placing same in an envelope for hand delivery addressed as follows:

[  ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows:

[ ] Faxing same via facsimile machine addressed as follows:

11

12

13

14

15

**VIA EMAIL**
**JUDITH TAPIA, USPPO**
**Judith_tapia@cacp.uscourts.gov**

16

17

18

This proof of service is executed at Santa Ana, California, on **June 3, 2024.**

19

I declare under penalty of perjury that the foregoing is true and correct to the best

20

of my knowledge.

21

22

/s/ Erica Bustos                     .

23

**Erica Bustos**

24

25

26

27

28